IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

PAULA TATE,                                    )
                                               )
                    Plaintiff,                 )
                                               )
            v.                                 )      Case No. 11-3095-CV-S-REL-SSA
                                               )
MICHAEL J. ASTRUE, Commissioner of             )
Social Security,                               )
                                               )
                    Defendant.                 )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Paula Tate seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Title XVI of the Social

Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) discounting the opinions of

Drs. Donald McGehee and Janice May; (2) assessing a residual functional capacity which is

unsupported by the evidence, and (3) failing to consider the totality of the evidence in

assessing plaintiff's credibility. I find that the substantial evidence in the record as a whole

supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for

summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On January 18, 2008, plaintiff applied for disability benefits alleging that she had been

disabled since December 1, 1999. Plaintiff's disability stems from type 2 diabetes, neuropathy,

Hepatitis C, high blood pressure, arthritis, back injury, "hole in back," emergency surgery,

slight problems from diabetes, severe joint pain, depression, feet numbness, swelling of hands,

joint pain, bipolar disorder, and extreme memory loss. Plaintiff's application was denied

initially on March 5, 2008, and on reconsideration it was denied on March 29, 2008. On

October 19, 2009, a hearing was held before an Administrative Law Judge. On November 20,

2009, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On

January 13, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

Case 6:11-cv-03095-REL   Document 13   Filed 02/21/12   Page 2 of 34

*III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

>  Yes = not disabled.
>  No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

>  No = not disabled.
>  Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

>  Yes = disabled.
>  No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

>  No = not disabled.
>  Yes =  go to next step where burden shifts to Commissioner.

3

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

Although plaintiff testified she has never worked a day in her life, the earnings record in the file shows that she earned $438.57 in 1978 (when she was 15), $221.24 in 1979 (when she was 16); $642.00 in 1980 (when she was 17), and $68.00 in 1995 (when she was 32) (Tr. at 125). In addition, plaintiff completed a Disability Report in which she reported having worked as a cashier clerk/stocker in 1995 for one night and as a sales clerk at a flea market off and on from 1978 through 1980 (Tr. at 133).

### Missouri Supplemental Questionnaire

Plaintiff completed a Missouri Supplemental Questionnaire in which she indicated that her husband is disabled and she has an 18-year-old son receiving SSI benefits (Tr. at 155). She is able to feed and water her animals, pay bills, use a checkbook, complete a money order, count change, do laundry, do dishes, make beds, change sheets, vacuum, sweep, do her banking, and go to the post office (Tr. at 156-157). She shops for a half hour with the help of her disabled husband (Tr. at 157). In describing difficulties with sleeping, plaintiff wrote, "I just like to sleep." (Tr. at 158). When asked what takes most of her time during the day, plaintiff wrote, "Nothing! I do mostly nothing!" (Tr. at 158). She is able to watch a 30-minute television show and a one-hour movie (Tr. at 158). She reads newspapers and magazines (Tr.

4

at 158).  She can use a computer for 20 to 30 minutes (Tr. at 159).  Her disabled husband

drives her places (Tr. at 159).

**B.    SUMMARY OF MEDICAL RECORDS**

On January 20, 2003, plaintiff began receiving treatment from Nadeem A. Kazi, M.D.,

on referral from Warren D. Kuipers, M.D. (Tr. at 416).  Plaintiff complained of feeling tired

and fatigued (Tr. at 416).  Dr. Kazi diagnosed Hepatitis C[1] (Tr. at 416).

On January 28, 2003, a liver biopsy revealed chronic portal and periportal with lobular

inflammation and bridging fibrosis (Tr. at 413).  In a letter dated September 15, 2004, Dr. Kazi

noted that he had treated plaintiff with interferon[2] and Ribavirin[3] therapy for forty eight weeks

(Tr. at 383).  Dr. Kazi noted that plaintiff had been doing well and had gained a significant

amount of weight since therapy had been stopped (she weighed 225 pounds) (Tr. at 383).

Plaintiff received treatment from April 7, 2004, through September 17, 2004, from

Peter Myskiw, D.P.M. (Tr. at 528-32).  On July 21, 2004, plaintiff underwent a surgical

---

[1]Hepatitis C is an infection caused by a virus that attacks the liver and leads to
inflammation.  Most people infected with the Hepatitis C virus (HCV) have no symptoms.  In
fact, most people do not know they have the Hepatitis C infection until liver damage shows up,
decades later, during routine medical tests.  Hepatitis C is one of several hepatitis viruses and is
generally considered to be among the most serious of these viruses.  Hepatitis C is passed
through contact with contaminated blood -- most commonly through needles shared during
illegal drug use.  http://www.mayoclinic.com/health/hepatitis-c/DS00097

[2]Interferons are a family of naturally-occurring proteins that are made and secreted by cells
of the immune system.  Commercially available interferons are human interferons
manufactured using recombinant DNA technology.  The mechanism of action of interferon is
complex and is not well understood.  Interferons modulate the response of the immune system
to viruses, bacteria, cancer, and other foreign substances that invade the body.  Interferons do
not directly kill viral or cancerous cells; they boost the immune system response and reduce the
growth of cancer cells by regulating the action of several genes that control the secretion of
numerous cellular proteins that affect growth.

[3]The records actually say "Ribaravin" therapy; however, it appears to be misspelled.
Ribavirin is used with an interferon medication to treat Hepatitis C in people who have not
been treated with an interferon before.  Ribavirin is in a class of antiviral medications called
nucleoside analogues.  It works by stopping the virus that causes Hepatitis C from spreading
inside the body.

5

resection of the right inferior calcaneal exostosis, or heel spur, in her right foot (Tr. at 531).

On September 14, 2005, Dr. Kazi wrote a letter to Dr. Kuipers indicating plaintiff had a reoccurrence of Hepatitis C (Tr. at 375). Dr. Kazi noted that plaintiff was alert and oriented times three and in no apparent distress (Tr. at 375). Plaintiff denied fatigue, abdominal pain, nausea, or vomiting (Tr. at 375). Dr. Kazi noted that plaintiff's Hepatitis C had been treated successfully in the past (Tr. at 375).

On February 5, 2007, plaintiff was examined by Dr. Sarah Hulsey for followup for diabetes (Tr. at 310). Dr. Hulsey noted that plaintiff was last seen almost one year earlier and had not been back "since she restarted Meth and using daily -- last usage was yesterday" (Tr. at 310). Dr. Hulsey noted that plaintiff was not taking insulin as prescribed (Tr. at 310). Plaintiff had a blood glucose level[4] of 308 to 400 mg/dl (Tr. at 313).

On March 15, 2007, plaintiff saw Dr. Hulsey for a check on her diabetes (Tr. at 309). Plaintiff was doing better with blood sugars in the 200-300s range. Plaintiff was still on methamphetamine, lost her bed at Horizon, and missed her gynecologist appointment, but reported that she was otherwise compliant with diet and medication.

An ultrasound of her pelvis on March 28, 2007, revealed an enlarged fibroid uterus and a simple right ovarian cyst (Tr. at 319).

On July 28, 2007, plaintiff was examined in the emergency room at Casa Grande Regional Medical Center ("Casa Grande") for complaints of back pain -- gradual onset and lasting two days (Tr. at 190-192). Plaintiff's functional limitations were: unable to bend, unable to sit up, unable to walk, and unable to do activities of daily living. Her blood sugar was 139. X-rays of her lumbar spine were normal. She was diagnosed with constipation and urinary tract infection. She was given Naproxen, a non-steroidal anti-inflammatory.

---

[4]Up to 100 mg/dL is normal.

6

On August 2, 2007, plaintiff returned to the emergency room at Casa Grande and reported pain in her back after trying to help push a car ten days previously (Tr. at 211-239). Plaintiff had a 10 cm hematoma of the left lumbar area, and blood sugar levels in the 700s with slight acidosis.[5] She said she had stopped using her insulin a week ago and had also stopped eating a week earlier. A review of systems was positive for back pain, abdominal pain, nausea, low-grade temperature, generalized weakness, decreased appetite, and noncompliance with medications (Tr. at 212). Plaintiff was diagnosed with hematoma, atrial fibrillation (her heart rate went up to 150 all of a sudden (Tr. at 211)),[6] pericarditis,[7] Hepatitis C, uncontrolled blood sugars, dehydration, deep venous thrombosis,[8] and alcohol and methamphetamine abuse (Tr. at 214-15).

---

[5]Diabetic acidosis, or ketoacidosis, is a serious condition that can lead to diabetic coma (passing out for a long time) or even death. When the cells do not get the glucose they need for energy, the body begins to burn fat for energy, which produces ketones. Ketones are acids that build up in the blood and appear in the urine when the body does not have enough insulin. They are a warning sign that diabetes is out of control or that the patient is getting sick. High levels of ketones can poison the body. When levels get too high, the patient can develop diabetic ketoacidosis.

[6]Atrial fibrillation is an irregular and often rapid heart rate that commonly causes poor blood flow to the body. During atrial fibrillation, the heart's two upper chambers (the atria) beat chaotically and irregularly -- out of coordination with the two lower chambers (the ventricles) of the heart. Atrial fibrillation symptoms include heart palpitations, shortness of breath and weakness.

[7]The pericardium is a thin, two-layered, fluid-filled sac that covers the outer surface of the heart. It shields the heart from infection or malignancy and contains the heart in the chest wall. It also prevents the heart from over-expanding when blood volume increases, which keeps the heart functioning efficiently. Pericarditis is inflammation of the pericardium.

[8]Deep vein thrombosis (DVT) is a condition in which a blood clot (thrombus) forms in one or more of the deep veins in the body, usually in the legs. Deep vein thrombosis can cause leg pain, but often occurs without any symptoms. Deep vein thrombosis can develop if the patient is sitting still for a long time, such as when traveling by plane or car, or if he has certain medical conditions that affect how his blood clots. Deep vein thrombosis is a serious condition because a blood clot that has formed in the vein can break loose, travel through the bloodstream and lodge in the lungs, blocking blood flow (pulmonary embolism).

On August 11, 2007, plaintiff was admitted to Casa Grande with a complaint of a large warm lump on the mid back -- unknown cause or source (Tr. at 256). The lump was getting larger and plaintiff reported the pain was increasing. An echocardiogram performed on the same day revealed moderate concentric left ventricular hypertrophy[9] with normal LV systolic function and no significant wall motion abnormality. She also had mild mitral regurgitation[10] and tricuspid regurgitation.[11]

On August 13, 2007, plaintiff underwent an incision and drainage of her lumbar abscess, and a debridement[12] of the abscess was performed on August 15, 2007 (Tr. at 220-222). The post and preoperative diagnoses were the same: 1) Abscess left side lumbar region, etiology unknown and 2) Intravenous drug abuser (Tr. at 222).

On August 21, 2007, plaintiff was admitted to Casa Grande for subacute rehabilitation for methicillin-susceptible staphylococcus aureus[13] lumbar abscess (Tr. at 296). Plaintiff was treated with antibiotics (Tr. at 296, 300). Plaintiff's blood sugar was in the 200s and plaintiff was advised to follow up with her primary care provider (Tr. at 296). On August 27, 2007, plaintiff was discharged (Tr. at 296).

---

[9] A type of tissue overgrowth in which the walls of the heart continue to increase but the exterior size remains the same and the internal size diminishes.

[10] Mitral valve regurgitation -- or mitral regurgitation -- happens when the heart's mitral valve does not close tightly, which allows blood to flow backward in the heart. When the mitral valve does not work properly, blood cannot move through the heart or to the rest of the body as efficiently, making the person feel tired or out of breath. Mitral valve regurgitation is also called mitral insufficiency or mitral incompetence. Treatment of mitral valve regurgitation depends on how severe the condition is, whether it is getting worse, and signs and symptoms. For mild cases, treatment may not be necessary. http://www.mayoclinic.com/health/mitral-valve-regurgitation/DS00421

[11] In this condition, the tricuspid valve does not close properly and blood flows back into the heart's upper right chamber (right atrium).

[12] Debridement is the removal of unhealthy tissue from a wound to promote healing.

[13] The type of staph infection which is sensitive to antibiotics.

8

On October 12, 2007, plaintiff was examined by Jamshid Mirzael, M.D., for a diabetes check (Tr. at 308). Plaintiff complained of left hip pain and right shoulder pain. Plaintiff rated her pain as a two on a scale of one to ten. She denied alcohol use. Dr. Mirzael diagnosed plaintiff with diabetes under poor control and left hip and shoulder pain. Plaintiff was given a prescription for Naproxen, a non-steroidal anti-inflammatory.

Plaintiff moved to Missouri from Arizona in late 2007. On January 18, 2008, she applied for disability benefits.

On January 25, 2008, plaintiff underwent a psychiatric consultative examination for the Wright County Family Support Division (Tr. at 427). The examination was administered by Janice May, Psy.D. (Tr. at 427-33). Dr. May noted that the information was by self-report from plaintiff and that it was important to note that the assessment represented only a sample of plaintiff's current psychological functioning (Tr. at 429). However, plaintiff appeared to be a reliable historian and so the results appeared to be valid (Tr. at 429).

Regarding plaintiff's substance abuse history Dr. May wrote:

> Mrs. Tate has a longstanding history of substance use and abuse. She noted she began drinking alcohol at age fourteen and then began smoking marijuana. In 1992 she started using Methamphetamines intravenously . . . . She has also used cocaine, hallucinogens and barbiturates. In May 1997, Mrs. Tate reported "getting clean" and staying clean for eight years. She "relapsed" with Methamphetamines in March 2006 and discontinued use in November 2007. She reported full remission for six months. At age forty-three, Mrs. Tate attended a 12-step program while in county jail, however she denied admissions to inpatient substance abuse treatment. . . . Mrs. Tate denied current involvement in AA or NA support groups and does not have a sponsor.

(Tr. at 430).

Plaintiff told Dr. May that she was not working because she had no work history, she had recently moved to Missouri, and she was having difficulty meeting her basic needs. Dr. May noted that plaintiff was not currently attending individual therapy or substance abuse treatment and was not on psychotropic medications for mental health reasons (Tr. at 431). Plaintiff reported her current symptoms included depressed mood, appetite disturbance,

low energy, mood swings, anxiety, hopelessness, and worthlessness. Dr. May performed a mental status examination and found plaintiff to have a depressed mood and affect along with slow and labored motor activity. Speech was normal in rate and tone, but motor activity appeared slow and labored at times. She was oriented to person, place and time, and memory appeared intact. Fund of general knowledge appeared average and consistent with background. Dr. May further noted that plaintiff did not appear to experience difficulty engaging in abstract thinking and judgment appeared intact. Intelligence was estimated to be average and insight into psychological functioning was fair. Attention and concentration were normal. Dr. May noted that plaintiff did not appear to have difficulty processing information in a logical and coherent manner as her thought processes were focused and goal directed. Dr. May diagnosed plaintiff with an adjustment disorder with depressed mood and methamphetamine dependence in early full remission.

Dr. May assessed plaintiff with a GAF score of 49[14] (Tr. at 433). Dr. May opined that plaintiff had mental difficulties which might limit her ability to engage in employment or gainful activity and would likely experience difficulties in concentrating, carrying out or remembering simple instructions, staying focused on a task or completing tasks to sustain employment (Tr. at 432). She stated that plaintiff's "expected duration of incapacity is estimated to be **6 to 12 months.**" (emphasis in the original) (Tr. at 432).

Ten days later, on February 4, 2008, Dr. May completed a disability certification for the Missouri Department of Social Services (Tr. at 435-436). Dr. May noted that plaintiff's primary diagnosis was adjustment disorder with depressed mood and amphetamine dependence. Dr. May found that plaintiff had a mental and/or physical disability preventing

---

[14]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

10

her from engaging in employment or gainful activity that was expected to last eight to twelve months (Tr. at 436). There is no explanation as to why the expected length of incapacity was different from that she listed ten days earlier other than that this was a form with durations to choose from, none of which matched her diagnosis from ten days earlier (Tr. at 436).

On February 6, 2008, David G. Paff, M.D., performed a physical consultative examination (Tr. at 336-351). Dr. Paff noted that plaintiff was morbidly obese, but that she could stand and walk without difficulty (Tr. at 337). Dr. Paff noted that plaintiff's blood glucose was 169 and hemoglobin A1C[15] was 7.2, which was mildly elevated (Tr. at 337). An x-ray of plaintiff's chest that revealed generous transverse cardiac diameter[16] was probably due to cardiomegaly[17] or pericardial effusion[18] (Tr. at 337). Dr. Paff diagnosed plaintiff with morbid obesity, hypertension, poorly controlled diabetes, Hepatitis C with elevated liver function testing, multiple joint pains, and a possibly enlarged heart (Tr. at 337). Dr. Paff also noted that plaintiff had an abscess of the lumbar spine which was ulcerated and needed treatment (Tr. at 337). Plaintiff had reported being an intravenous user of methamphetamine for 18 years (Tr. at 336). She also had smoked for the past 18 years. Plaintiff was taking Lisinopril (for high blood pressure), NovoLog (insulin), and Novolin (insulin). Plaintiff was not on any pain medication. Dr. Paff did not make any findings as to functional limitations, but he found that plaintiff was "certainly disabled for at least a year" (Tr. at 337).

---

[15]The A1C test is a common blood test used to diagnose type 1 and type 2 diabetes and then to gauge how well a patient is managing his diabetes. The A1C test result reflects the average blood sugar level for the past two to three months. Specifically, the A1C test measures what percentage of hemoglobin -- a protein in red blood cells that carries oxygen -- is coated with sugar (glycated). The higher the A1C level, the poorer the blood sugar control.

[16]The horizontal distance between the most rightward and leftward borders of the heart seen on a postero-anterior (PA) chest radiograph.

[17]Enlargement of the heart.

[18]The accumulation of excess fluid around the heart.

11

In a letter to plaintiff dated February 19, 2008, Dr. Paff wrote that " . . . you were noted to have hypertension, poorly controlled diabetes, multiple joint pains, hepatitis C with abnormal liver function testing, enlargement of your heart, and mild anemia. You should see your personal physician concerning these findings as soon as possible." (Tr. at 338).

On March 8, 2008, Charles Bowles, Ph.D., reviewed the evidence of record, and completed a psychiatric review technique (Tr. at 352-362). Dr. Bowles noted plaintiff's history of noncompliance and stated that plaintiff's allegations of mental limitations were not credible (Tr. at 362). Dr. Bowles opined that plaintiff's mental impairments were non-severe (Tr. at 352, 362).

In April 2, 2008, plaintiff began receiving treatment from Misty Martin, PA-C, at the Family Walk-in Clinic ("Family Walk-in") for uncontrolled insulin dependent diabetes and an ulcerated back lesion (Tr. at 571). On April 7, 2008, plaintiff saw Ms. Martin who examined plaintiff and found that she had a normal cardiac exam, she had normal strength in her upper and lower extremities, she had full range of motion and no edema (Tr. at 569). Miss Martin encouraged plaintiff to stop smoking. She diagnosed plaintiff with diabetes, hypertension, osteoarthritis (based on plaintiff's report that she had arthritis in her hands and hips), ulcer of the back, and diabetic peripheral neuropathy (again, based on plaintiff's report that she suffered from that condition) (Tr. at 569).

On April 17, 2008, plaintiff's back ulcer was much improved and she was being referred to a plastic surgeon for her back ulcer (Tr. at 566). Plaintiff had elevated liver function tests and was diagnosed with hypocalcemia[19] (Tr. at 566). Plaintiff's dosage of Lantus (insulin) was increased (Tr. at 566). On May 27, 2008, plaintiff reported difficulty sleeping

---

[19]An abnormally low concentration of calcium in the blood.

Case 6:11-cv-03095-REL   Document 13   Filed 02/21/12   Page 12 of 34

and denied pain except for some chest pain when lying supine, but which disappeared when sitting up (Tr. at 558).

On September 2, 2008, plaintiff had been out of medications for one to two weeks[20] (Tr. at 553). She complained of heart palpitations (Tr. at 553). She was diagnosed with hypertension, insulin dependent diabetes, congestive heart failure,[21] muscle spasm and Hepatitis C (Tr. at 553).

On September 17, 2008, Ms. Martin noted plaintiff had not been taking Lantus (insulin), her diabetes was uncontrolled, but that her medication for chest pain was working well (Tr. at 548).

On December 19, 2008, Ms. Martin completed a form for the Missouri Department of Social Services (Tr. at 546-547). Ms. Martin's primary diagnosis was Hepatitis C, and the secondary diagnosis was insulin dependent diabetes (Tr. at 547). Ms. Martin declined to rate plaintiff's incapacity and instead indicated that plaintiff should be referred to a Hepatitis C clinic (Tr. at 547).

On December 31, 2008, Ms. Martin noted that plaintiff did not keep her appointment at the Hepatitis C clinic (Tr. at 545). Plaintiff complained of right sided abdominal pain two nights earlier (Tr. at 545). Ms. Martin diagnosed plaintiff with hypertension, insulin dependent diabetes, and Hepatitis C (Tr. at 545).

---

[20]Plaintiff testified that she was out of her medication on one occasion and it was right after she got out of jail and was awaiting her Medicaid coverage; however, this occurred before the incarceration plaintiff testified about.

[21]Inability of the heart to keep up with the demands on it and, specifically, failure of the heart to pump blood with normal efficiency. When this occurs, the heart is unable to provide adequate blood flow to other organs such as the brain, liver and kidneys. The signs and symptoms can include shortness of breath (dyspnea), asthma due to the heart (cardiac asthma), pooling of blood (stasis) in the general body (systemic) circulation or in the liver's (portal) circulation, swelling (edema), blueness or duskiness (cyanosis), and enlargement (hypertrophy) of the heart.

From January 14, 2009, through April 27, 2009, plaintiff, who was incarcerated at the Chillicothe Correctional Center, continued to receive treatment for her mental health, Hepatitis C, diabetes, and back pain (Tr. at 438-523). Initially, plaintiff received counseling as it was thought she might be a suicide risk, but it was concluded that she did not currently appear to be a high risk for suicide (Tr. at 438).

On February 26, 2009, plaintiff refused medication and the assessment included "non-compliance related to medical maintenance, and non-compliance related to mental health maintenance" (Tr. at 479).

On April 12, 2009, the assessment again included "non-compliance related to medical maintenance, and non-compliance related to mental health maintenance" (Tr. at 514).

On May 27, 2009, Donald McGehee, Ed.D., performed a psychiatric consultative examination (Tr. at 419-421). Plaintiff told Dr. McGehee that she used IV methamphetamine "and most other kinds of drugs" between 1980 and 1997. "She was arrested on drug related charges at least twelve times. She spent one year in jail and four and a half years in prison."

Plaintiff reported experiencing insomnia, headaches, nausea, cold sweats, undue perspiration, clammy hands, and palpitations. "The intensity of these symptoms appears to be experienced by her as being quite severe and disabling." Dr. McGehee noted that plaintiff appeared to have a severely depressed mood. However, her affective responses were congruent and appropriate, and her speech was clear logical and coherent. There was no evidence of loose or bizarre thought associations. "Also noted were circumstantiality, blocking, derailments, and obsessions." Dr. McGehee administered a Millon Clinical Multiaxial Inventory (MCMI-III) test. Plaintiff did not meet the criteria for a personality disorder. Her clinical profile was significant for anxiety, "but otherwise her test results are benign." The test revealed that plaintiff tended to have a variety of somatic complaints associated with physiological overarousal. Dr. McGehee noted that plaintiff had never held a

14

job or worked for a salary. Dr. McGehee diagnosed a generalized anxiety disorder, and assessed a GAF score of 60.[22]

On June 4, 2009, Dr. McGehee completed a disability certification from the Missouri Department of Social Services for plaintiff stating that plaintiff had a disability that precluded her from engaging in employment or gainful activity, the duration of which was expected to last 6 to 12 months, but he did not include any rationale (Tr. at 525-526).

On July 6, 2009, Ms. Martin saw plaintiff (Tr. at 542). Plaintiff reported that she was recently out of prison and had run out of all of her medications. Ms. Martin observed slight ankle edema.[23] Plaintiff's heart had a regular rate and rhythm. Her respirations included scattered wheezing. The rest of her exam was normal. Ms. Martin diagnosed uncontrolled diabetes, hypertension, and edema (Tr. at 542). Ms. Martin prescribed Lisinopril (for high blood pressure), Nitroglycerin (for chest pain), Coreg (treats heart failure), NovoLog (insulin), HCTZ (for high blood pressure), Lantus (insulin), insulin syringes, and glucose monitoring equipment (Tr. at 540-541).

On July 9, 2009, Ms. Martin noted plaintiff's blood glucose levels as 321 on Tuesday, 167 on Wednesday, and 284 on Thursday, and increased plaintiff's dosage of Lantus (Tr. at 539). On July 13, 2009, the blood glucose levels were reported as ranging from 177 to 237 (Tr. at 538).

On July 18, 2009, plaintiff telephoned Ms. Martin and indicated that her fasting sugars were ranging from 168 to 222 over the past three days (Tr. at 537). Ms. Martin again increased plaintiff's dosage of Lantus. (Tr. at 537).

_____

[22]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

[23]Swelling caused by fluid in the body's tissues.

15

On July 29, 2009, Dr. Donald McGehee completed a medical source statement-mental (Tr. at 424-426). Dr. McGehee found that plaintiff was moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was markedly limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

16

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to respond appropriately to changes in the work setting

(Tr. at 425-426).

C.    *SUMMARY OF TESTIMONY*

During the October 19, 2009, hearing, plaintiff testified; and Cathy Hodgson, a vocational expert, testified at the request of the ALJ.

1.    **Plaintiff's testimony.**

At the time of the hearing, plaintiff lived with her husband (Tr. at 30). Her son was in prison at the time and she expected him to live with her once he gets out (Tr. at 30). Plaintiff has never worked (Tr. at 30). Plaintiff is supported by her husband who is disabled (Tr. at 31).

Plaintiff pled guilty for receiving stolen property even though she testified that she was not guilty (Tr. at 48). She was accused of taking a computer and a television set (Tr. at 49). Her husband actually stole it (Tr. at 49). Plaintiff served 4 1/2 months in jail (Tr. at 49).

Plaintiff is 5'2" tall and weighs 247 pounds (Tr. at 38). Plaintiff gained about 70 pounds after she moved to Missouri from Arizona almost two years ago because after her husband went to prison, food became her best friend (Tr. at 38, 39). Plaintiff watches her diet by eating lots of fruits and vegetables (Tr. at 38). She has been doing that for a long time (Tr. at 38). She does not believe she is eating more than she is allowed to on her diabetic diet (Tr. at 39). Plaintiff checks her blood sugar from six to ten times a day (Tr. at 40). Her blood sugar usually is around 200, but the night before the hearing it was 468 (Tr. at 40). Usually when her blood sugar is high, she cannot tell (Tr. at 40). She can only tell when her blood sugar gets low (Tr. at 40). She gets cold sweats and shakes (Tr. at 40). Plaintiff then added as an afterthought that when her blood sugar gets high, her vision is blurry (Tr. at 40).

17

Plaintiff suffers from severe depression; however, she is not being treated for it because she has other things to take care of first (Tr. at 33-34). Plaintiff does not like to go outside because she does not want to see people, although she gets along well with people (Tr. at 43-44). She feels like people are watching her or judging her (Tr. at 44). When asked if she has any difficulty, due to pain or anxiety, paying attention to things or concentrating on something she is doing, she said she does not (Tr. at 44).

Plaintiff cannot sit or stand for long periods of time, meaning an hour or more (Tr. at 34). She alternates sitting and standing, she lies down, she moves around, she walks back and forth, and she repositions herself (Tr. at 34). It hurts to stand and walk due to neuropathy (Tr. at 34). With switching positions she could probably stand for two to three hours total each workday (Tr. at 35). She gets short of breath very easily due to her heart (Tr. at 34). Plaintiff notices that she gets short of breath when she talks too fast (Tr. at 41). She keeps five bottles of nitroglycerin pills around her house (Tr. at 41). They help when she experiences chest pain, although they give her a headache (Tr. at 41). After her chest pain goes away, she typically sits in a chair for an hour or two (Tr. at 42). Every day she experiences the feeling of a heavy chest (Tr. at 41). It happens randomly throughout the day and is not caused by anything she can identify (Tr. at 41).

Plaintiff has Hepatitis C and has been on one form of treatment that can only be done one time (Tr. at 42). She has a huge liver and she has pain around that area (Tr. at 42). She has water in her liver and has to take water pills (Tr. at 42). Due to her liver pain, plaintiff does not eat large meals and she pushes on her liver a lot (Tr. at 42-43).

Plaintiff experiences numbness and tingling in her toes to where they feel like they are on fire (Tr. at 43). This usually happens later in the day when she has her shoes off (Tr. at 43).

Plaintiff has a five-inch hole in her back (Tr. at 36). She does not know what caused it, but she had a huge abscess next to her spine (Tr. at 37). She was supposed to have a skin graft

18

after the surgery to remove the abscess but the plastic surgeon would not do it because her liver enzymes were too high (Tr. at 37).

Plaintiff is unable to open jars with her dominant hand -- her last two fingers swell and she is unable to wear her rings anymore[24] (Tr. at 46-47). Although plaintiff can hold a pen, writing hurts her joints (Tr. at 47). Plaintiff's hands do not swell, only the finger joints (Tr. at 47). Her doctor told her it is arthritis (Tr. at 47). Plaintiff does not have a computer but she has used one at the library (Tr. at 47). She types with one finger although she used to type 60 words per minute (Tr. at 48). When asked whether it was her hands that keep her from typing, plaintiff testified she does not remember how (Tr. at 48).

When plaintiff was in the hospital for her back, she went blind in her left eye, but her vision came back (Tr. at 51). That was caused by her diabetes (Tr. at 51). She now can see up close but not small print (Tr. at 51). No one has ever suggested that she needs glasses (Tr. at 51). She had her vision tested; she was able to see far away; but she has never told anyone her vision bothers her because, "There's so many things on my list right now that that wasn't the one at the top of my list when I got out of prison." (Tr. at 51). She does not keep a written list of her problems -- she keeps the list in her head (Tr. at 51).

Plaintiff's hips hurt when she walks and lies on her side (Tr. at 52). "I don't know. I just put it to my arthritis." (Tr. at 52). Her shoulder used to hurt because she was pushed into a bed by a nurse at the hospital but her shoulder is OK now -- it has not been hurting lately (Tr. at 52).

---

[24]Although plaintiff testified she is unable to wear her rings, it appears she had them on at the hearing: "This one is cut right here so I bend it and take it off. And this one . . . it's a little bit big and so I don't wear any other rings. This one, like I said, it's kind of on the back so I can just bend it and get it off. And I don't wear rings because I couldn't get them off and on anymore." (Tr. at 46).

19

During the day, plaintiff gets dressed, brushes her teeth, makes breakfast, sits down for a while, makes the bed, lies on the couch or walks outside, sits on the porch, does some dishes (Tr. at 35). Plaintiff is normally up for about two hours before she feels the need to lie down (Tr. at 36). She lies down for about a half an hour (Tr. at 36). Plaintiff is able to sweep and do dishes (Tr. at 45). When she swept last, however, she had to sit down because she was out of breath (Tr. at 45). Her husband cooks, although she testified that he is disabled (Tr. at 45). Plaintiff has never had a driver's license[25] (Tr. at 45).

Plaintiff said that she ran out of her medication one time (Tr. at 49). When she was asked when that was, she changed her testimony: "No. I usually make sure I always have medication." (Tr. at 49). The ALJ then asked her which it was -- had she ever run out or not (Tr. at 49). Plaintiff said she did run out one time a long time ago when she first got out of prison (which was since she moved to Missouri less than two years earlier) (Tr. at 49). She had to wait a few weeks with no medication before she could get on Medicaid (Tr. at 49). Plaintiff is still on Medicaid (Tr. at 49). Plaintiff experiences dizziness and drowsiness from her medications (Tr. at 45). She believes her heart medication and her high blood pressure medication cause these side effects (Tr. at 46). When asked if those side effects limit her in any way, plaintiff said, "I don't know. It could be a factor why I have to rest." (Tr. at 46).

Plaintiff testified that she used to smoke quite a bit, but when she got out of prison she cut down and now smokes about four cigarettes a day (Tr. at 50). The ALJ noted that plaintiff's records indicate that she needs to attend Alcoholics Anonymous and Narcotics Anonymous (Tr. at 250). Plaintiff said, "I still go to AA to this day only because we don't, Mountain Grove

_____

[25]Although she testified that she has never in her life had a driver's license, it appears plaintiff has driven without one at some point. "I just, I have a fear of freeways for years. I don't know. I was always afraid of the other job and I have drove before though, but I don't drive." (Tr. at 45). In addition, she told Dr. May that she had been in and out of jail and one of the reasons was for driving without a license (Tr. at 430).

doesn't have an AA, but I have been going to NA since '97." (Tr. at 50). Plaintiff said her sobriety date for drugs was July 16, 2007 (Tr. at 52). Her sobriety date for alcohol was December 14, 2008 (Tr. at 52-53).

In 2007 plaintiff went to the Casa Grande Regional Medical Center for lower back pain after she was pushing a stock car up into a trailer (Tr. at 53). She testified that she had not been using her back however -- she was pushing with her hands and her butt (Tr. at 53). A day or two later she woke up and could not walk (Tr. at 53). Plaintiff was loading the car with her husband and son, one of whom was the race car driver and "won all the time." (Tr. at 54).

## 2. Vocational expert testimony.

Vocational expert Cathy Hodgson testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could perform unskilled light or sedentary work; could stand or walk for 30 minutes at a time; could sit for 45 minutes at a time; needs to shift in place at will while seated but can remain on task; cannot push or pull levers with her legs; may occasionally bend, twist, turn, stoop, squat; cannot ever crawl or kneel; can frequently climb stairs; cannot power grip with her dominant hand; can frequently handle, finger or feel; cannot use air or vibrating tools or motor vehicles; cannot work around unprotected heights or moving machinery; cannot work in temperature extremes of cold or heat or humidity; and cannot read type smaller than newspaper print (Tr. at 56-58). The person would have a mild restriction in working around supervisors, coworkers and the public and in adapting to work situations with changes in the workplace (Tr. at 58). The vocational expert testified that such a person could work as a general assembler, with 140,000 in the national economy and 4,000 in the region; a table worker, with 32,000 in the nation and 650 in the region; or an administrative support worker with 120,000 in the nation and 2,300 in the region, and these jobs allow for changing positions from standing to walking every 30 minutes and sitting every 45 minutes (Tr. at 58-59).

Case 6:11-cv-03095-REL   Document 13   Filed 02/21/12   Page 21 of 34

The next hypothetical was the same as the first except adopting the residual functional capacity assessment by Dr. McGehee (Tr. at 425-426) who found that plaintiff would have a marked limitation in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting (Tr. at 59, 425-426). The vocational expert testified that the limitations listed by Dr. McGehee would preclude all work, "even simple, unskilled work." (Tr. at 60).

The third hypothetical was the same as the first except the person would need to rest every two hours for 30 minutes at a time by lying down, sitting down, reclining, or otherwise being away from the work station (Tr. at 60). The vocational expert testified that such a person could not work because customary breaks in the morning and afternoon are 10 to 15 minutes long, not 30 minutes (Tr. at 60).

The vocational expert testified that things which would be gripped in an unskilled job are "so small that power gripping would not be required." (Tr. at 61). Unskilled work generally does not require a lot of reading; however, it requires the ability to put together small parts which are larger than newspaper print (Tr. at 61). The form completed by Dr. McGehee states that plaintiff is markedly limited in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruption from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods (Tr. at 425-

22

426).  All of those things are under a category called "Sustained Concentration and Persistence" (Tr. at 425).  When Dr. McGehee completed this form, he circled the word "sustained" but did not explain why (Tr. at 425).  The vocational expert interpreted the doctor in saying plaintiff was markedly limited after having circled "sustained," as meaning that plaintiff could not, for an eight-hour period of time, maintain attention and concentration; however, she does not know for sure what he meant (Tr. at 63-64).  The form also includes a category indicating that the number and length of rest periods are unreasonable which would preclude all unskilled work even if the limitation were only moderate (Tr. at 65).  The only way that category would make sense is if the person had "no" limitation (Tr. at 65). Dr. McGehee's form also includes at the bottom a section which says, "Based on the following factors:" and five factors are listed; however, he put slash marks next to two of them:  medical history and clinical findings (Tr. at 426).  The vocational expert does not know what the slash marks mean as there are no objective factors listed on the form (Tr. at 66).

V.    FINDINGS OF THE ALJ

Administrative Law Judge James Gillet entered his opinion on November 20, 2009 (Tr. at 12-22).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 14).

Step two.  Plaintiff suffers from the following severe impairments in combination: adjustment disorder with depressed mood, amphetamine dependence, alcoholism, morbid obesity, hypertension, diabetes, mild anemia, hyperglycemia, Hepatitis C with Cirrhosis of the liver, generalized anxiety disorder, lumbar abscess, anemia, xerosis (abnormal dryness) of skin, mild cardiomegaly, poor eye sight, status post staph infection, status post right inferior caolaneal exostosis (heel spur removal), left shoulder pain, and left hip pain (Tr. at 14).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

23

Step four. Plaintiff's subjective complaints are not entirely credible (Tr. at 18-19). Plaintiff has the residual functional capacity to perform sedentary work except that she can stand and walk for 30 minutes at a time, sit for 45 minutes at a time; needs to be able to shift at will while seated; should never use her left lower extremity to push or pull levers; can occasionally stoop, bend, or crawl; can frequently climb; cannot power grip with her right hand; cannot use vibrating or air tools; cannot work in temperature extremes or at unprotected heights; cannot read or type smaller newsprint; and cannot kneel (Tr. at 15). Plaintiff has a mild limitation in her ability to remember (may perform SPV 3-4 work) and has a mild limitation in her ability to handle contact with supervisors, co-workers or the public and the ability to respond to work situations or changes in routine (Tr. at 16). Plaintiff has no past relevant work (Tr. at 21).

Step five. Plaintiff can perform the jobs of general assembler, table worker, or administrative support worker, all available in significant numbers (Tr. at 22).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. Plaintiff points out that even though she is able to do things around the house, she testified that she must take rest periods, that she had ongoing uncontrolled diabetes despite treatment and medication, and the examining doctors found plaintiff disabled (for up to a year at most).

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d

24

836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records or in the claimant's testimony), the claimant has reported the daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations and allegations of disability. The claimant has no significant barriers with respect to personal care, is capable of preparing meals, and performing house work (laundry, dishes, etc). Further, the claimant is able to handle shopping responsibilities and financial matters, as such needs may arise. The claimant's testimony of functional limits appears extreme, but the undersigned notes that such limitations are not supported (to such an extreme degree) by the objective medical evidence in the record. While this does not necessarily indicate the claimant deliberately attempted to mislead,

25

it does erode the credibility of the claimant's allegations. Overall, the claimant's reports of limited daily activities are considered to be outweighed by the other factors discussed herein.

The undersigned notes that the claimant is prescribed medications appropriate to her conditions, which successfully treat her conditions without materially adverse side-effects (drowsiness, dizziness and weight gain noted). Additionally, the claimant has not required long-term intensive treatment for any of her conditions. The undersigned also notes that the claimant readily acknowledges working only 1 day in her life, which raises a question as to whether claimant's continuing unemployment is actually due to medical impairments. Lastly, the undersigned notes that the following factors in the record erode the claimant's credibility: The claimant has failed to demonstrate attempts to access available medical services and has not sought social services network help, as would be expected for a person alleging totally disabling symptoms; the claimant has failed to follow up or seek appropriate treatment regarding her allegedly disabling symptoms; the claimant has minimized her drug addition/alcoholism with her treating physicians; and the claimant shows marked improvement when she is treated (and complies with instructions) for her symptoms. However, in an effort to give the claimant the benefit of the doubt in this matter, the undersigned has incorporated much of the claimant's subjective complaints into the above residual functional capacity assessment.

(Tr. at 18-19).

## 1. *PRIOR WORK RECORD*

Plaintiff has never worked. She stated that she chose to stay home and raise her family. The fact that plaintiff has never been motivated to work outside the home suggests that she is not working now for the same reason. Plaintiff's husband is disabled and has disability income. Her son is disabled and has disability income. It is possible plaintiff is exaggerating her impairments in order to increase her family's income by putting herself in the same position as her other family members. (In addition, when a claimant testifies before an administrative law judge that she can essentially do nothing and that everything is done by members of the family who have previously been found disabled, it does not suggest that the claimant is being entirely honest.)

The Eighth Circuit has noted that "[a] lack of work history may indicate a lack of motivation to work rather than a lack of ability." Pearsalt v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001); Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993).

26

## 2.   DAILY ACTIVITIES

Plaintiff told doctors that she tries her best to take care of the house and keep up on laundry, cooking and basic needs.  She testified that she and her husband pushed a race car onto a trailer -- but that she did not use her back, she used her hands and her butt.  It appeared that plaintiff attempted to minimize her ability to carry out such a physical activity despite complaining of disabling symptoms.  If plaintiff were as functionally impaired as she alleges, she would not have even attempted to push a car.  "Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations."  Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001).

## 3.   DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff has never been on medication for pain besides a non-steroidal anti-inflammatory.  She has never been on medication for depression or anxiety or any other mental health condition.  She has had Hepatitis C; however, it has not manifested itself with any physical limitations.  She has diabetes which is for the most part uncontrolled.  However, plaintiff testified that despite having gained 70 pounds in less than two years and being categorized as morbidly obese, she does not believe she eats any more than her diabetic diet allows.  This certainly indicates that although plaintiff may believe she is being compliant, she is not.  The records also indicate periods when plaintiff ran out of insulin, when she was hospitalized for diabetic ketoacidosis which is caused by failure to eat and failure to take insulin, both things that she admitted at the hospital she had done in the preceding week.  The record establishes that plaintiff's pain and her mental condition are not bad enough to require any treatment or any medication, and that her uncontrolled diabetes is at least in part due to noncompliance with treatment.  A failure to follow a recommended course of treatment weights against a claimant's credibility.  Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005); Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).

27

4.   *PRECIPITATING AND AGGRAVATING FACTORS*

Plaintiff complained of back pain after pushing a car onto a trailer.  She was hospitalized for complications from diabetes after she failed to eat or use insulin for a week. Plaintiff complains of vision problems but she has never been told she needs glasses and has never sought any eye exam to see if glasses would help her see.  Plaintiff testified that when her blood sugar is high, she cannot tell.  She only has symptoms when her blood sugar is low -- and according to plaintiff's medical records, her blood sugar is rarely if ever low (it was never observed to be low at any doctor's office).  Any difficulties due to depression are aggravated by plaintiff's failure to seek any treatment for that conditions -- and her reason is that she has too many other things to take care of first.  However, that is not plausible since plaintiff regularly sees a doctor for diabetes management and that doctor could also treat depression.  Although plaintiff testified about hip pain that causes her difficulties with sitting, standing and walking, she has never been prescribed any kind of pain medication other than a non-steroidal anti-inflammatory.  Plaintiff testified that she has heart problems which cause her to be out of breath and that she takes nitroglycerine and keeps five bottles of that medication around her house.  However, the records show that she has only been prescribed nitroglycerine one time (in July 2009) by a physicians assistant who had observed slight ankle edema and remarked in the notes that plaintiff's cardiac exam was normal.  Additionally, despite claiming to suffer shortness of breath, plaintiff continues to smoke.

5.   *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

Plaintiff has been prescribed a non-steroidal anti-inflammatory for her pain.  She has never been prescribed any medication for mental impairments.  The records indicate that plaintiff was not compliant with her diabetes treatment.  Her treatment for Hepatitis C was successful, and she has never suffered any limitations due to that disease.  Although she testified to side effects, she did not report these to her treating physicians.

28

6. *FUNCTIONAL RESTRICTIONS*

No doctor has ever placed plaintiff on functional restrictions due to any of her impairments.

Plaintiff's reports to her doctors have not been consistent. For example, she told one doctor that she had never been in prison and had never been arrested for drugs but told another doctor that she had been arrested for drugs at least a dozen times and had spent 4 1/2 years in prison. Her complaints of disabling conditions are not consistent with her medical records. For example, she believes she cannot work due to being depressed, but she has never complained of depression to any treating doctor. She testified about difficulty with her vision, but no doctor has suggested she may need glasses and she has never pursued a remedy for poor vision. She is morbidly obese and gained 70 pounds in less than two years, but she believes she is compliant with her diabetic diet. She alleges that she experiences disabling shortness of breath; however, she continues to smoke cigarettes.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not entirely credible.

VII. *OPINIONS OF DRS. DONALD MCGEHEE AND JANICE MAY*

Plaintiff argues that the ALJ improperly discounted the opinions of Dr. Donald McGehee and Dr. Janice May, both mental health professionals who examined plaintiff at the request of the government when she applied for government benefits.

Dr. McGehee examined plaintiff one time and assessed generalized anxiety disorder. He assigned a GAF of 60, which means moderate symptoms. He indicated that except the anxiety, all of her other test results were benign. Despite these very moderate findings, Dr. McGehee completed a form required for plaintiff to receive government benefits through the Missouri Department of Social Serv ices by checking the box indicating that plaintiff "does have a mental and/or physical disability which prevents him/her from engaging in that

29

employment or gainful activity for which his/her age, training, experience or education will fit him/her." He made no findings at all regarding plaintiff's limitations which made this opinion nothing more than a conclusion. Dr. McGehee is not a vocational expert, and his summary conclusion that plaintiff could perform no job at all based on suffering from anxiety is not worthy of reliance.

A couple months after he examined plaintiff, Dr. McGehee completed another form, this time in connection with her application for Social Security disability benefits. In this form, Dr. McGehee -- who had found that plaintiff suffers only from anxiety and who had a GAF of 60 during Dr. McGehee's one exam -- found that plaintiff was "markedly" limited in her ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. There is absolutely nothing in the records of his examination which would support such findings. Also curious is the fact that Dr. McGehee ranked not one factor as being "not significantly limited," again, despite his very moderate findings on exam. This includes the ability to adhere to basic standards of neatness and cleanliness, in which Dr. McGehee found plaintiff was moderately limited, when his exam records state that, "She was neat and clean in appearance and was wearing appropriate casual clothing. She exhibited adequate personal hygiene." It is clear from Dr. McGehee's records of the one psychological evaluation, compared to the very restrictive findings he made in the medical source statement, that his opinion in the medical source statement is not based on his exam but rather is based on either

Case 6:11-cv-03095-REL   Document 13   Filed 02/21/12   Page 30 of 34

his desire to secure government benefits for plaintiff or some other motivation. The findings are not entitled to much weight, and the ALJ properly discounted that opinion.

The ALJ discussed the findings of Dr. McGehee and Dr. May simultaneously:

[T]he undersigned affords the opinions of Janice May, Psy.D. and Donald E. McGehee, Ed.D., little weight. Dr. May and Dr. McGehee opined that the claimant is unable to engage in employment or gainful activity due to her impairments. However, the undersigned notes that even Dr. May noted that the claimant's expected duration of disability/incapacity would only be for 8-12 months total (Dr. McGehee opined the incapacity would be for 6-12 months in total), which does not meet the duration requirements of our rules and regulations. Moreover, the opinion of a treating physician[26] is entitled to great weight unless there is persuasive contradictory evidence. A treating physician's medical opinion on the issue of the nature and severity of an impairment is entitled to special significance; and, when supported by objective medical evidence and consistent with other substantial evidence of record, entitled to controlling weight. (Social Security Ruling 96-2p). On the other hand, statements that a claimant is "disabled," "unable to work," can or cannot perform a past job, meets a Listing or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner, who cannot abdicate his statutory responsibility to determine the ultimate issue of disability. Opinions on issues reserved to the Commissioner, such as those of the doctors reported above, can never be entitled to controlling weight, but must be carefully considered to determine the extent to which they are supported by the record as a whole or contradicted by persuasive evidence. (20 CFR 404.1527(d)(2) and Social Security Ruling 96-5p.). The doctors apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. For example, many opinions in their respective sources statements are not supported by their own contemporaneous treatment/examination notes. At other times, the doctors have overlooked obvious drug abuse and alcoholism factors. It is also important to note that the physician's treatment has not increased in aggressiveness, frequency, or interim adjustments to justify such levels of inability. Further, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes [sic] for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients . . . and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(Tr. at 19-20).

---

[26]Neither Dr. McGehee nor Dr. May were treating physicians.

31

Dr. May examined plaintiff on one occasion in connection with her application for government benefits. Dr. May found that plaintiff "presented in a forthright manner and appeared to be a reliable historian. Therefore, results appear to be a valid and reliable indicator of Mrs. Tate's psychological functioning". However, plaintiff told Dr. May that she "has never been to prison, nor been arrested for substance abuse issues." (Tr. at 430). However, she told Dr. McGehee that, "She was arrested on drug related charges at least twelve times. She spent one year in jail and four and a half years in prison." (Tr. at 420). Clearly Dr. May's reliance on plaintiff's "forthright manner" was misplaced.

Dr. May found that plaintiff would "likely" experience difficulties concentrating -- however, in her notes, she indicated that plaintiff's attention and concentration were normal. She found that plaintiff would likely experience difficulties with carrying out or remembering simple instructions; however, the notes of her exam reflect no difficulty with understanding or remembering. She found that, "Depending upon Mrs. Tate's internal motivation and willingness/ability to seek treatment, the expected duration of incapacity is estimated to be 6 to 12 months." This appears to mean that should plaintiff seek treatment, Dr. May would expect her period of incapacity to be six months. In any event, the durational requirement for Social Security disability is not met.

Also noteworthy is that plaintiff told Dr. May that her reason for never having worked was because she chose to be a stay-at-home mom -- unrelated to any physical or mental impairment. She also stated that her reasons for not working at the time of the exam were that she had no employment history, she had just moved to Missouri, and she was having trouble meeting her basic needs.[27] These reasons are not related to any alleged impairment.

---

[27]I interpret this to mean a financial inability -- plaintiff told Dr. May that she took care of her house and kept up on laundry, cooking and basic needs.

The most important point with respect to these two doctors, however, is the fact that Dr. McGehee diagnosed nothing other than anxiety, and Dr. May did NOT diagnose anxiety. Dr. May diagnosed adjustment disorder with depressed mood, but Dr. McGehee did not. One would think that if a claimant had a disabling mental impairment, it would be noticed by both of the mental health professionals who examined her within a short time of each other. Instead it appears that for whatever reason both doctors wanted to secure benefits for plaintiff and went about it in different ways. The fact that Dr. May believed plaintiff was unable to work due to adjustment disorder when Dr. McGehee did not even believe she had such a condition, and the fact that Dr. McGehee believed that plaintiff was unable to work due to anxiety when Dr. May did not believe she suffered from anxiety supports the ALJ's decision not to give much weight to these two opinions. On top of that, plaintiff testified at the administrative hearing that she had no difficulty due to anxiety, she had no difficulty paying attention, and she had no difficulty concentrating.

Finally, both doctors were aware that plaintiff was not on any medication for depression or anxiety. She regularly saw treating doctors to manage her diabetes and had for years. A primary care physician is capable of prescribing medication for depression or anxiety if he believes it is necessary. The fact that plaintiff had never been treated for any mental health impairment suggests that either it was not bad enough for her ever to have mentioned it to a doctor or no doctor ever thought her symptoms warranted a prescription.

Based on all of the above, I find that the ALJ did not err in failing to give controlling weight to the opinions of Dr. McGehee and Dr. May.

## VIII.    *RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT*

Plaintiff argues that the ALJ erred in assessing a residual functional capacity unsupported by the record.

33

The ALJ stated that in assessing plaintiff's residual functional capacity, he considered opinion evidence, he outlined all of the medical evidence, he discussed plaintiff's subjective complaints and analyzed those, he considered plaintiff's credible subjective complaints, he considered plaintiff's obesity, he gave great weight to the records of plaintiff's treating doctors, and even considering plaintiff's substance abuse, he found her condition to be not disabling.

It is the ALJ's responsibility to determine claimant's residual functional capacity based on all the relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of her limitations." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) . As discussed above, the ALJ properly discredited plaintiff's subjective complaints and he properly gave little weight to the opinions of Dr. McGehee and Dr. May, both of whom saw plaintiff one time in connection with her applications for government benefits. Based on the credible evidence of record, the ALJ properly found that plaintiff retained the residual functional capacity to perform substantial gainful activity which exists is significant numbers in the national and regional economy.

## IX.     CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge


Kansas City, Missouri
February 21, 2012

Case 6:11-cv-03095-REL   Document 13   Filed 02/21/12   Page 34 of 34